IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| BELINDA RAY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 2:08-CV-757-WKW [WO] |
| ) | |
| MICHAEL DONLEY, Acting Secretary, ) | |
| Department of the Air Force, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Belinda Ray brings this action against Defendant Michael Donley, Acting Secretary of the Department of the Air Force, for race and sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e *et seq.* ("Title VII"). This cause is before the court on Defendant's Motion for Summary Judgment or, in the Alternative, to Dismiss. (Doc. # 21.) Defendant maintains that the intra-military immunity doctrine renders Plaintiff's claim non-justiciable, and that the court, therefore, lacks subject matter jurisdiction. Alternatively, Defendant contends that on the merits, no genuine issues of material fact exist, and that Defendant is entitled to judgment as a matter of law. Upon careful consideration of counsel's briefs, the relevant law, and the record as a whole, the court finds that Defendant's motion to dismiss for lack of subject matter jurisdiction is due to be granted.

## I. JURISDICTION AND VENUE

The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations in support of both. Subject matter jurisdiction is discussed below.

## II. FACTUAL BACKGROUND

### A. Structural Overview of the 908th Airlift Wing

This case arises out of the failure to promote Ms. Ray within the ranks of the United States Air Force Reserve. At all relevant times, Ms. Ray served as an Air Force Reserve Technician ("ART" or "military technician") with the 908th Airlift Wing at Maxwell Air Force Base, Alabama. Her position is statutorily defined as "dual status," which means that she is a full-time civilian employee who is "required as a condition of that employment to maintain a membership in the [Air Force] Reserve." 10 U.S.C. § 10216(a). More specifically, Ms. Ray "is assigned to a civilian position as a technician in the organizing, administering, instructing, or training of the [Air Force] Reserve or in the maintenance and repair of supplies or equipment issued to the [Air Force] Reserve or the armed forces." *Id.*

Generally, the Air Force Reserve "provide[s] trained units and qualified persons available for active duty in the armed forces, in time of war or national emergency, and at such other times as the national security may require" and "fill[s] the needs of the armed forces whenever more units and persons are needed than are in the regular components." 10 U.S.C § 10102. The purpose of the 908th Airlift Wing (hereinafter, "the Wing") in particular is to transport troops and supplies in C-130 Hercules airplanes. (Pl.'s Dep. 44 (Doc. # 23,

Ex. A); Underkofler Decl. ¶ 2 (Doc. # 23, Ex. F).) The Wing is composed of approximately 1,200 traditional reservists and approximately 175 hybrid military/civilian ARTs. (Pl.'s Dep. 44; Underkofler Decl. ¶¶ 2, 3.) According to Air Force Regulations, ARTs must "[m]eet Air Force physical and military assignment requirements," "[m]aintain active membership in the Air Force Reserve unit in which the position is authorized," and "[b]e assigned militarily to the designated ART position." (Underkofler Decl., Attach. A, at 2.) ARTs "play vital roles in the combat readiness of their reserve unit by training other reservists and serving as mobilization assets when the unit is mobilized." (Underkofler Decl., Attach. A, at 2.) ARTs maintain a military rank and a civilian/military duty title. (*See* Leathers Decl. ¶ 4 (Doc. # 23, Ex. B).)

**B.     Ms. Ray's ART Position**

At the time of the employment decision at issue, Ms. Ray held a GS-1702-09 Training Technician position in the Education and Training Office ("ETO" or "the Office") of the Wing's Mission Support Group. (Pl.'s Dep., Ex. 6.) Her civilian and military duty title was Assistant Chief, Education and Training, and her military rank was Master Sergeant. (Pl.'s Dep., Attach. 4; Leathers Decl. ¶ 5.) The ETO has two primary tasks: (1) ensuring that reservists receive military-specific Air Force Specialty Code ("AFSC")[1] on-the-job training and (2) providing reservists with education counseling and assistance. (Pl.'s Dep. 69-70;

---

[1] According to Colonel Michael J. Underkofler, AFSC on-the-job training ensures "that the members of the Reserve can perform their combat roles in the National Defense, such as fixing planes, flying planes, providing medical care, guarding people and transporting troops and supplies." (Underkofler Decl. ¶ 6.)

3

Leathers Decl. ¶ 2; Forshey Decl. ¶ 4 (Doc. # 23, Ex. E); Underkofler Decl. ¶ 6.)  After being promoted to the CS-09 position in 2003, Ms. Ray handled the ETO's on-the-job training, which included counseling traditional reservists during the monthly Unit Training Assemblies (also known as "drill weekends") and answering the reservists training questions. (Pl.'s Dep. 80-89.)

At all relevant times, Ms. Ray's temporary immediate military and civilian supervisor was Captain Colby Leathers (Ray Aff. ¶ 3 (Doc. # 27, Ex. D); Leathers Decl., Attach. A); her second-level military supervisor was Major Sara Butler, a traditional reservist (Butler Decl. ¶ 2 (Doc. # 23, Ex. G); Leathers Decl., Attach. A); her second-level civilian and third-level military supervisor was Colonel William J. Forshey, Jr. (Ray Aff. ¶ 3; Forshey Decl. ¶ 7); and her third-level civilian and fourth-level military supervisor was Colonel Underkofler (Ray Aff. ¶ 3; Underkofler Decl. ¶ 1).

**C.   Chief Opening**

Between 2000 and July 1, 2006, Duane Lubbert, an ART holding the military and civilian title of Chief, Education and Training, served as the direct supervisor and manager of the ETO.  (Pl.'s Dep. 38.)  Mr. Lubbert served as Ms. Ray's immediate military and civilian supervisor from 2003 until July 1, 2006.  (Pl.'s Dep. 38; Lubbert Dep. 239 (Doc. # 23, Ex. H); Leathers Decl. ¶ 4.)  Mr. Lubbert was required to vacate his ART position by October 1, 2006, the date on which he would reach the Air Force Reserve's mandatory retirement age.  (Lubbert Dep. 239; Leathers Decl. ¶ 4.)

4

Mr. Lubbert took a leave of absence on July 1, 2006.  (Leathers Decl. ¶ 4; Lubbert Dep. 239; Pl.'s Dep. 101.)  Prior to his departure, Mr. Lubbert spoke to Major Benneta[2] about the possibility of detailing Ms. Ray into his position (at a GS-1702-11 rate of pay).  (Lubbert Dep. 254-55; Pl. Dep. 104.)  During Mr. Lubbert's absence and prior to the selection of his permanent replacement, Captain Leathers assumed Mr. Lubbert's supervisory oversight duties, and Ms. Ray assumed most of Mr. Lubbert's day-to-day activities.  (Pl.'s Dep. 111; Leathers Decl. ¶ 9.).

**D.   Hiring Process**

In July 2006, Captain Leathers began the process of soliciting applications for Mr. Lubbert's permanent replacement.  (Leathers Decl. ¶ 10; Pl.'s Dep. 110-13.)  Ms. Ray and eleven other candidates applied for the Chief, Education and Training ART position. (Leathers Decl. ¶ 11, Attach. B.)  All applicants submitted "career briefs" along with their applications, containing information related to the applicants' work experience.  (Leathers Decl. ¶ 11; Pl.'s Dep. 112-13.)  After reviewing the applications and career briefs, Captain Leathers eliminated seven applicants who either lacked the necessary military status for the position or who did not work in the Education and Training Series.  (Leathers Decl. ¶ 12.) After two others withdrew, the only remaining applicants were Ms. Ray and Master Sergeant

---

[2] Although Defendant contends that Mr. Lubbert spoke to someone named Major "Vonada" prior to his departure, (Def.'s Summ. J. Br., at 7 (Doc. # 22)), Mr. Lubbert stated in his deposition that he spoke to someone named Major "Benneta" (Lubbert Dep. 254-55).

Roderick Parker, an African-American male ART who served as the Training Manager for the Wing's Maintenance Group. (Pl.'s Dep. 113-15; Leathers Decl. ¶¶ 11-12.)

Captain Leathers interviewed Ms. Ray and Mr. Parker separately in Major Butler's office. (Butler Decl. ¶ 4; Leathers Decl. ¶ 15.) Major Butler attended the interviews as a witness. (Butler Decl. ¶ 4.) Both Captain Leathers and Major Butler were in uniform during the interviews. (Leathers Decl. ¶ 15.) After conducting the interviews, which followed identical formats,[3] Captain Leathers discussed the applicants' performance with Major Butler.[4] (Leathers Decl. ¶¶ 17-19; Butler Decl. ¶¶ 4, 7.) According to Defendant, Mr. Parker's enthusiasm, confidence, and communication skills set him apart from Ms. Ray, who appeared to be nervous and "going through the motions" during the interview. (Butler Decl. ¶¶ 5-6; Leathers Decl. ¶¶ 17-19.) Captain Leathers maintains that Mr. Parker's experience, including his participation in Air Force Command level inspections, reflected highly on him. (Leathers Decl. ¶ 22.) In sum, Captain Leathers believed that Mr. Parker was best-qualified

---

[3] The five questions asked during the interviews were: (1) "Describe your experience or training in planning, directing, controlling, and overseeing all of the elements of Education, Training, and Distance Learning Programs," (2) "Describe your experience or training in providing Education and Training advisory services to commanders and staff on all education and programs," (3) "Describe your experience or training dealing with periodic inspections of activities pertaining to Education and Training for compliance with policies and instructions," (4) "Describe your experience or training related to conducting staff visits and training of personnel within [the] unit on education and training programs under your responsibility," and (5) "Describe your experience or training related to performing personnel supervisory and/or management responsibilities." (Doc. # 27, Ex. 13.)

[4] Ms. Ray contends that Major Butler did not take part in the selection process and, in fact, was not permitted to do so. (*See* Pl.'s Aff. ¶ 3.)

for the job.  (Leathers Decl. ¶ 25.)  He informed Colonel Forshey of his selection and sent an email explaining his rationale for the decision.  (Leathers Decl. ¶ 26, Attach. D.)

Pursuant to the Wing's chain of command for ART hiring decisions, both Colonel Forshey and Colonel Underkofler had to concur in the selection.  (Forshey Decl. ¶¶ 9-10; Underkofler Decl. ¶¶ 9-10.)  Both Colonel Forshey and Colonel Underkofler found Captain Leathers' decision to be reasonable and supported by the record, and concurred in his decision.  (Forshey Decl. ¶¶ 9-11; Underkofler Decl. ¶¶ 9-10.)  Captain Leathers informed Ms. Ray of the decision during a strategic planning weekend while both were in uniform and on active duty.  (Pl.'s Dep. 195-96; Leathers Decl. ¶ 27.)

Ms. Ray, who has three associates degrees and who had worked in the wing-level education office for thirteen years, maintains that she was better-qualified for the position, and that the decision to promote Mr. Parker was improperly motivated by race and/or sex.  (Compl. ¶¶ 12-13, 24-26 (Doc. # 1).)  After exhausting her administrative remedies, Ms. Ray filed the instant action for race and sex discrimination on September 12, 2008.

### III.  STANDARD

Challenges to the justiciability of a claim are properly raised in a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.  *See Morrison v. Amway Corp.*, 323 F.3d 920, 924-25 (11th Cir. 2003).  Such motions take the form of either a "facial" or "factual attack."  *Id.* at 924 n.5.  Facial challenges to subject matter jurisdiction are based solely on the allegations in the complaint, which are taken as true for the purposes of the motion.

7

*Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).  However, where, as here, the defendant relies on evidence outside the pleadings, no such presumption of truth exists, and the court "may hear conflicting evidence and decide the factual issues that determine jurisdiction." *Gilmore v. Day*, 125 F. Supp. 2d 468, 470-71 (M.D. Ala. 2000) (citing *Colonial Pipeline Co. v. Collins*, 921 F.2d 1237, 1243 (11th Cir. 1991)); *Lawrence*, 919 F.2d at 1529 ("Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction – its very power to hear the case – there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.").  The Eleventh Circuit has cautioned, however, that district courts should only rely on Rule 12(b)(1) where the "facts necessary to sustain jurisdiction do not implicate the merits of plaintiff's cause of action."  *Garcia v. Copenhaver, Bell & Assoc., M.D.'s, P.A.*, 104 F.3d 1256, 1261 (11th Cir. 1997).

Here, Defendant relies on extrinsic evidence in challenging subject matter jurisdiction.  The facts upon which Defendant relies, however, are largely undisputed.

## IV. DISCUSSION

Ms. Ray filed suit under § 2000e-16(a) of Title VII, which provides that "[a]ll personnel actions affecting employees or applicants for employment . . . in military departments as defined in section 102 of Title 5 . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."  Title VII thus waives federal sovereign immunity for military departments.  *See* 29 C.F.R. § 1614.103.  However,

in accord with the *Feres* doctrine discussed below, the Equal Employment Opportunity Commission and the vast majority of circuit courts to interpret this statute have held that it "appl[ies] only to suits by civilian employees of the military departments, and not members of the armed forces." *Fisher v. Peters*, 249 F.3d 433, 438 (6th Cir. 2001). Thus, the justiciability of this case first depends on whether a military technician such as Ms. Ray – one who maintains dual status as a civilian and reservist – may bring suit under § 2000e-16(a).

It has long been established that United States military personnel may not bring actions based on injuries suffered incident to their service in the armed forces. *Walch v. Adjutant Gen.'s Dept. of Tex.*, 533 F.3d 289, 294 (5th Cir. 2008) (citing *Feres v. United States*, 340 U.S. 135, 146 (1950)). This rule – the "*Feres* doctrine" – is "premised on the disruptive nature of judicial second-guessing of military decisions." *Walch*, 533 F.3d at 296 (citing *United States v. Brown*, 348 U.S. 110, 112 (1954)). Although *Feres* arose in the context of the Federal Tort Claims Act, it has since been expanded to apply to § 1983 claims, *see Crawford v. Tex. Army Nat'l Guard*, 794 F.2d 1034, 1035-36 (5th Cir. 1986), and Title VII claims, *see Brown v. United States*, 227 F.2d 295, 299 (5th Cir. 2000). However, while the *Feres* doctrine prevents Title VII suits by military personnel, courts are split as to whether a dual-status military technician may, at least in theory, bring suit under Title VII for claims arising out of his or her *civilian* status.

Because the Eleventh Circuit has not addressed this particular issue, Defendant urges the court to adopt the approach taken by the Sixth Circuit and hold that *Feres* bars all Title

9

VII suits by military technicians because such positions are "irreducibly military in nature."[5] *See Fisher*, 249 F.3d at 443-44. Defendant also cites a First Circuit opinion, *Wright v. Park*, 5 F.3d 586, 587 (1st Cir. 1993), and a Fifth Circuit opinion, *NeSmith v. Fulton*, 615 F.2d 196, 201 (5th Cir. 1980),[6] to support its contention that the court need not look past Ms. Ray's job title in determining whether to exercise subject matter jurisdiction in this case. However, *Wright* and *NeSmith* were not Title VII cases, and, as discussed below, are distinguishable on this basis. The court is not aware of any other circuit that follows the Sixth Circuit's bright-line rule that a Title VII suit by a military technician is "irreducably military in nature," and, thus, non-justiciable as a matter of law. By contrast, the vast majority of circuits to address the issue have distinguished suits arising from a military technician's status as a member of the military from suits arising from his or her status as a civilian federal employee. The Ninth Circuit, for example, allows Title VII suits by military technicians for claims that do not challenge conduct "integrally related to the military's unique structure." *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995) (noting that "personnel actions are not always integrally related to the military's unique structure"). The Second Circuit, which characterizes § 2000e-16(a) of Title VII as an "exception to the *Feres* doctrine," adopted a slightly modified variation of the Ninth Circuit's approach. In *Overton*

---

[5] Ms. Ray, on the other hand, proceeds on the assumption, and with no supporting argument, that the court will not adopt this position.

[6] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit prior to October 1, 1981.

*v. New York State Division of Military & Naval Affairs*, the Second Circuit held that the *Feres* doctrine "does not permit" a Title VII claim by a military technician if the claim "(1) challenges conduct integrally related to the military's unique structure or (2) is not purely civilian" in nature. 373 F.3d 83, 95 (2d Cir. 2004) (internal citations and quotations omitted). Along these lines, the Fifth Circuit (while explicitly addressing and distinguishing its decision in *NeSmith*) held that "claims arising purely from an ART's civilian position are provided for under Title VII; claims that originate from an ART's military status, however, are not cognizable." *Brown*, 227 F.3d at 299 n.4; *see also Willis v. Roche*, 256 F. App'x 534, 537 (3d Cir. 2007) ("We agree with our sister courts of appeals and, therefore, we must determine whether [the plaintiff's] discrimination claims arise 'purely from [his] ART[ ] civilian position.'" (quoting *Brown*, 227 F.3d at 299)).

The court finds persuasive the Fifth Circuit's rationale for differentiating Title VII suits from § 1983 suits. Title VII – and § 2000e-16(a) in particular – as opposed to § 1983, "specifically provides for claims against the government for civilian employees in the military departments." *Brown*, 227 F.3d at 299 n.4. Thus, as the Fifth Circuit in *Brown* held, courts must "differentiate the civilian and military positions associated with a dual-status job." *Id.* A dual-status military technician may bring suit under Title VII, but only for claims arising out of his or her status as a civilian.

However, as Defendant aptly points out, what exists in theory may not always exist in practicality. In all of the cases cited above that follow an approach similar to that of the

11

Fifth Circuit, none found the military technician's claim to be justiciable. Ms. Ray's attempts to distinguish her case fall short.

As evidence that her claim arises from her status as a civilian, Ms. Ray notes that the promotion would not have affected her military rank and that her second-level military supervisor, Major Sara Butler (her only non-ART military supervisor), was not permitted to take part in the promotion decision. Indeed, these facts distinguish her claim from those of *Mier* and *Brown*. In *Mier* and *Brown*, the plaintiffs challenged decisions directly related to their military rank and/or status. *See Mier*, 57 F.3d 747 (Title VII claim arising from the plaintiff's failure to receive a military promotion); *Brown*, 227 F.3d 295 (Title VII claim arising from the plaintiff's military discharge). In so doing, those plaintiffs challenged decisions "central to maintenance of the military's hierarchy." *Mier*, 57 F.3d at 751. However, while *Mier* and *Brown* are factually distinguishable from the case at bar, the courts' reasoning – and the policy behind that reasoning – is nonetheless informative.

An employment decision can affect the "maintenance of the military's hierarchy" without directly affecting military rank. Here, Ms. Ray challenges a decision that would have changed her military title (from *Assistant Chief*, Education and Training to *Chief*, Education and Training) and her corresponding duties and assignments. More importantly, however, is the fact that Ms. Ray challenges a decision made by civilian supervisors who also served as her military supervisors. The Second Circuit, in *Overton*, addressed a similar situation. There, the plaintiff challenged the alleged discriminatory behavior of his supervisor during

12

business hours when both he and his supervisor "were performing what [the plaintiff] assert[ed] were purely civilian duties." 373 F.3d at 95. Recognizing that at the "time the conduct of which [the plaintiff] complain[ed], his status was 'civilian,'" the Second Circuit nonetheless concluded that because the plaintiff's supervisor served the dual role of civilian and military superior, the plaintiff's suit, "if permitted to proceed, would likely affect his military relationship with" his supervisor. *Id.* at 96. This, according to the court, would impermissibly intrude into the affairs of the military. *Id.* Likewise, here, those who made the decision not to promote Ms. Ray served the dual roles of military and civilian supervisors. These supervisors considered both Ms. Ray's and Mr. Parker's military experience in making that decision. As in *Overton*, the court's interference in these decisions would undoubtedly affect Ms. Ray's relationship with her military supervisors and result in an impermissible intrusion into the affairs of the military.

The court in *Overton* carefully narrowed its decision to the facts before it and noted that in the appropriate situation, a military technician's Title VII claim could *conceivably* go forward. 373 F.3d at 96. However, Ms. Ray has not provided a persuasive basis for allowing this particular case to proceed. Notwithstanding the overlapping chain of command, the military-centric nature of the Wing, and of the Education and Training Office in particular, cannot be overlooked. (*See* Underkofler Decl. ¶¶ 9-10.) The Education and Training Office provides on-the-job training that, according to Colonel Underkofler, "ensures that the members of the Reserve can perform their combat roles in the National Defense, such as

13

fixing planes, flying planes, providing medical care, guarding people and transporting troops and supplies." (Underkofler Decl. ¶ 6.) The decision relating to who should fill the leadership role as the Chief of an office that oversees this type of on-the-job training necessarily implicates military affairs.

The only case Ms. Ray cites that allowed a military technician's Title VII claim to proceed is distinguishable from this case. In *Laurent v. Green*, the plaintiff, Valerie Laurent, alleged that a co-worker sexually harassed her during civilian working hours, and that after filing a discrimination complaint, Ms. Laurent's co-worker subsequently retaliated against her by denying her an educational opportunity. No. 2004-0024, 2008 WL 4587290, at *1-2 (D. V.I. Oct. 10, 2008). In exercising subject matter jurisdiction over Ms. Laurent's Title VII claims, the district court found that "[c]reating a hostile environment is not integrally related to the military's mission" and that "[t]he Court would not be treading in an area that it does not belong by allowing Laurent to pursue a civil remedy for such sexual harassment." *Id.* at *3. Furthermore, the court noted that the alleged retaliation (a denial of an educational opportunity) did not have any effect on Ms. Laurent's military status or training. *Id.* at *4. The classes Ms. Laurent sought to attend were not "of a military nature." *Id.*

*Laurent* is distinguishable from this case on several bases. First, unlike Ms. Laurent, Ms. Ray challenges the decision of military and civilian *supervisors*, and she does not claim that any of these supervisors sexually harassed her. Second, as discussed above, the hiring decision at issue here did in fact affect Ms. Ray's military title and duties. She would have

14

been promoted to a leadership position overseeing an office with distinct military training purposes. In sum, unlike the plaintiff in *Laurent*, Ms. Ray has failed to show that her claim should be characterized as arising from her "purely civilian status."

## V. CONCLUSION

For the foregoing reasons, the court finds that Ms. Ray's Title VII claim does not arise from her status as a civilian, and, therefore, is not justiciable. Accordingly, it is ORDERED that Defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure (Doc. # 21) is GRANTED.[7] An appropriate judgment will be entered.

DONE this 7th day of April, 2010.

                                                          /s/ W. Keith Watkins
                                            UNITED STATES DISTRICT JUDGE

---

[7] Because the court grants Defendant's motion to dismiss for lack of subject matter jurisdiction, it does not address Defendant's motion for summary judgment or the merits of Ms. Ray's Title VII claim.